ROBERTS, J.,
for the Court:
¶ 1. Pamela Anne Little Stennis (Pam) claims the Harrison County Chancery Court erred when it distributed the proceeds of the sale of the home that she and her brother, Thomas L. Stennis III (Todd), owned as joint tenants. Pam also claims the chancellor should have awarded her a setoff for rent during the time that Todd was the sole occupant of the house after he “constructively evicted” her. Pam also claims the chancellor should have awarded her a setoff for one-half of the insurance proceeds related to damage caused by Hurricane Katrina. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. This case centers on the partition of a 4,823 square foot house in Gulfport, Mississippi. Pam and Todd’s father, Thomas Stennis II, died in 1991. Pam and Todd’s mother, Patsy Stennis, died in 1995. Patsy deeded the house jointly to Pam and Todd. There was no mortgage on the house.
¶ 3. Todd lived in the house consistently after his and Pam’s mother died. When Pam and Todd acquired the title to the house in 1997, Pam was living in New York City. Todd had exclusive use of the house. Even so, Pam paid one-half of the household expenses other than utilities.
¶ 4. In 2002, Pam moved to Gulfport. She and Todd both lived in the house. She continued to pay one-half of the expenses, and she also began to pay one-half of the utilities. In September 2002, Todd took out a $190,000 mortgage on the home. Sixty percent of the borrowed money went toward renovations. Todd used the remaining forty percent of the borrowed money for his own personal use, such as the restoration of a car. The monthly mortgage payment was $1,600. $960 of each mortgage payment was for the home renovations, so Pam paid one-half of that figure each month. Stated differently, Pam paid $480 of the monthly mortgage payment and Todd paid the remainder, since almost one-half of the mortgage payment was attributable to money that did not benefit the house.
¶ 5. From the time that Pam moved into the house until early 2004, Pam and Todd’s relationship became increasingly strained *1109 and hostile. One volatile argument ensued after Pam moved some of her furniture into the house and rearranged some of the furniture and artwork in the common areas of the house. Additionally, Pam testified that Todd refused to allow her to park her car in either of the spaces in the two-car garage. According to Pam, Todd reacted violently when she moved a desk in one of the rooms. In April 2004, Pam moved out. She stopped contributing to the house expenses in May 2004.
¶ 6. Todd married his wife, Vanessa, in July 2004. Vanessa and her dog moved into the house with Todd. Pam testified that she tried to return to the house in August or September 2004, but she was not welcome at the house. According to Todd, Pam was welcome to return to the house, but her dog could not come with her. Todd also told Pam that she would have to resume paying her share of the house expenses. Pam never moved back into the house. In December 2004, Pam filed her complaint.
¶ 7. Todd responded and argued that the house should be sold by a commissioner’s sale on the courthouse steps. Todd also filed a counterclaim for Pam’s share of the house expenses. In response, Pam argued that the house should be sold on the open real-estate market to maximize the proceeds of the sale. Pam further argued that she was entitled to one-half of the rental value of the house after she moved out in early 2004.
¶ 8. The house was damaged when Hurricane Katrina made landfall in August 2005. The proceedings were delayed based on the damage Hurricane Katrina caused both to the home and the Gulf Coast in general. Pam later claimed that she was entitled to one-half of the insurance proceeds from the damage caused by Hurricane Katrina.
¶ 9. In October 2009, the chancellor entered an order that the house would be listed on the open real-estate market for one hundred twenty days. If the house did not sell within that time, a special commissioner was to sell it by auction. The order also notes that Pam and Todd had yet to divide the personal property within the house.
¶ 10. The house did not sell within the time provided in the chancellor’s order. Consequently, the special commissioner auctioned the home. Todd bought the house for $404,000. Meanwhile, Pam and Todd divided the personal property within the house.
¶ 11. The chancellor distributed the proceeds of the sale after paying off the remaining balance of the 2003 mortgage. The chancellor held that Todd was not obligated to pay Pam one-half of the rental value of the home after Pam moved out in April 2004. However, the chancellor also held that Pam was obligated to pay Todd one-half of the house expenses from the time that she moved out. Pam’s share of those expenses totaled approximately $73,400. Ultimately, Pam received approximately $76,700 from the proceeds of the sale, and Todd received approximately $48,600. Finally, the chancellor held that Pam was not entitled to one-half of the insurance proceeds from the damage caused by Hurricane Katrina except any insurance proceeds that might be disbursed on outstanding claims after March 9, 2010. Pam appeals.
STANDARD OF REVIEW
¶ 12. “The standard of review for property partition cases is whether this Court finds manifest error in the decision of the chancellor[;] only then will this Court reverse the findings of the chancellor.” Georgian v. Harrington, 990 So.2d *1110 813, 815 (¶ 7) (Miss.Ct.App.2008) (citation omitted).
ANALYSIS
I. RENT
¶ 13. Pam sought to recover rent from Todd. Specifically, Pam sought one-half of the rental value of the house from the time she moved out in April 2004 until Todd purchased the home in March 2010. Initially, the chancellor held that Pam was not entitled to rent because she never requested such relief in her pleadings.
¶ 14. After Pam filed a motion for reconsideration, the chancellor held that Pam was not entitled to rent from Todd because Pam could have returned to the house after she moved out in April 2004, but she chose not to do so. The chancellor also noted that Pam had failed to prove that Todd “constructively evicted” her from the house. Finally, the chancellor noted that he had requested information regarding the rental value of the house, but he had never received that information. Consequently, the chancellor denied Pam’s motion for reconsideration.
¶ 15. Pam argues that the chancellor erred when he held that she was not entitled to rent because she did not request rent in her pleadings. However, based on the chancellor’s reasoning in his order denying Pam’s motion for reconsideration, it is clear that the chancellor based his decision on the evidence rather than the absence of a request for rent in Pam’s pleadings.
¶ 16. Pam argued that Todd had “constructively evicted” her from the house. Pam claimed that Todd mistreated her and that he was hostile toward her. As the chancellor noted, “[c]onstructive eviction is normally found in the context of landlord/tenant cases.” A more appropriate legal term for Pam’s allegation is that Todd had committed “ouster.” “An ouster is the wrongful dispossession or exclusion by one tenant in common of his cotenants from the common property of which they are entitled to possession.... It does not necessarily imply an act accompanied by force.” Cheeks v. Herrington, 523 So.2d 1033, 1036 (Miss.1988) (citation omitted).
¶ 17. There is no question that Pam and Todd did not get along well. Pam testified that living with Todd “was quite volatile,” that “there was a great deal of anger there,” and that they “did not get along under the same roof.” Todd’s testimony indicated that Pam’s version of events was sensationalized. According to Todd, he and Pam “definitely” had “an occasional shouting match.” Todd’s wife, Vanessa, testified that Pam was “passive-aggressive” toward Todd. According to Vanessa, she once heard Pam say, “I’m going to get [Todd] one of these days; he’s going to regret it; I’m going to get him.”
¶ 18. Pam testified that Todd yelled at her “a great deal,” that there “was a great deal of brow beating,” and that she “lived in a constant panic attack [that she would do something that] would set him off.” Pam’s friend, Edward Cullin, testified that he saw Todd “become extremely angry [and] agitated,” and it got “progressively worse up until the point where [Cullin] was concerned about [Pam].” Cullin described Todd as “filled with rage. Rage that I felt was unwarranted at the time. It was excessive. And I thought that — I was concerned about [Pam’s] well[-]being with [Todd] being as upset as he did get at her.” Cullin further testified that Todd used expletives excessively and that he screamed them at Pam “very, very loudly.”
¶ 19. According to Pam, Todd behaved violently on occasion, which Todd denied. Pam testified that Todd grabbed her and left a handprint on her arm once after *1111 Pam “missed dusting a desk in his room.” Cullin also testified that he saw bruises on Pam’s arms. And Todd’s wife, Vanessa, testified that she was not aware of any violent altercations. But according to Pam, “one of the ugliest situations ... [she had] ever witnessed” occurred after she moved a desk before Todd considered a refinished floor to have adequately cured. Pam testified that:
Well, in the middle of the night[,] he came in my room and ... jerked me out of my bed by my arm, and told me that I was never to move anything again.... I had a Great Dane at the time, and the dog did what he was supposed to do[;] he was putting himself between me and my brother, and he threatened to send the dog to the great dog house in the sky. [Todd said] [t]hat I better do something with that dog. And it was one of the ugliest scenes I think I’ve ever had to witness. It scared the unmitigated hell out of me.
¶ 20. Pam testified that Todd would not allow her to exercise dominion over the house. It was undisputed that Todd would not allow Pam to park in either of the two spaces in the garage because he “was utilizing those two stalls.” According to Pam, she “couldn’t move anything [in the house] from the place it had been for the last ten years.” On cross-examination, Pam added that Todd would not allow her to hang a plant on the back porch or hang a painting in the dining room. She used her bedroom as a private apartment, and she “very seldom used the common rooms in the house.” Based on Pam’s characterization, she “was an unwelcome guest in [her] own home.”
¶ 21. One event seems to have resulted in a particularly volatile disagreement. Todd testified that Pam told him that she would be moving some furniture from her New York apartment into her room at the house while he was out of town. Todd did not object to that. However, according to Todd, when he returned from his trip, he discovered that “the entire house had been rearranged to accommodate virtually all of [Pam’s] New York City apartment furniture, as well as her artwork.” Todd said that Pam rearranging the furniture “created a serious argument between the two of us.”
¶ 22. Ultimately, Pam moved out of the house in April 2004. Pam explained that she “needed to have sanctuary” and that she “had to leave to keep her own sanity intact.” Pam also testified twice that she “didn’t even want to be around [Todd].” Todd testified that he did not ask Pam to leave. Pam stopped paying her share of the expenses related to the house after she left. Pam attempted to move back into the house during August or September 2004. According to Todd, he did not object to Pam moving back into the house. However, Todd insisted that Pam pay her share of the house expenses, including the arrearage that resulted after Pam stopped paying in April 2004. Pam did not move back into the house.
¶ 23. As the chancellor noted, Pam and Todd had split the expenses related to the maintenance of the house from the time they acquired joint title after their mother died in 1995 until Pam left the house in April 2004. The chancellor also noted that Pam only sought to obtain one-half of the house’s rental value after her dispute with Todd arose. From Pam’s perspective, she only sought rent after Todd effectively forbade her from exercising any real dominion over the house.
¶ 24. A portion of the chancellor’s decision was based on a lack of information regarding the rental value of the house. During a preliminary hearing, the chancellor announced that “Mr. Molyneaux” would be providing information as to the house’s *1112 rental value. The record does not contain any such information from Mr. Molyneaux. However, exhibit fourteen was a letter dated September 1, 2009, from realtor Jane Anne Sawyer addressed to Pam’s lawyer with a carbon copy to the chancellor. Within that letter, Sawyer stated that “the house would rent for about $2,500.00 per month.” Sawyer added that the “rental market in this price range is almost nonexistent presently.” Consequently, the record contained at least some evidence regarding the house’s estimated rental value.
¶ 25. Be that as it may, we must find manifest error to reverse the chancellor’s judgment. See Robberson v. Burton, 790 So.2d 226, 228 (¶ 9) (Miss.Ct.App.2001). Despite the availability of evidence regarding the house’s rental value, we do not find that the chancellor committed manifest error. There was evidence to support the chancellor’s conclusion that Pam was not “constructively evicted” — or more appropriately, ousted — from the house. The chancellor had the authority to “adjust the equities between [Pam and Todd] and determine all claims of the ... coten-ants .... ” Miss.Code Ann. § 11-21-9 (Rev. 2004). Although reasonable minds could weigh the evidence in Pam’s favor and conclude that Todd was hostile toward Pam and that he refused to allow her to exercise dominion over aspects of the house, “this Court may not intercede simply to substitute our collective opinion for that of the chancellor.” Hammers v. Hammers, 890 So.2d 944, 950 (¶ 14) (Miss.Ct.App.2004) (citation omitted). Pam stopped paying her share of the house expenses when she moved out in April 2004. The chancellor awarded Todd a set-off equivalent to the value of Pam’s half of the expenses from the time that Pam moved out until Todd bought the house in 2010. In effect, Pam paid her share of the expenses. However, as the chancellor noted, Pam was living in New York when her and Todd’s mother passed away in 1995. Pam began living in the house along with Todd during late 2001 or early 2002. Pam paid one-half of the house expenses from the time she and Todd acquired the house until she moved out in April 2004. Pam never sought to recover rent from Todd while she was living in New York. Based on the fact that Pam had not previously sought rent from Todd when she was not living in the house, it was within the chancellor’s discretion to find that Pam was not entitled to recover a setoff for rent. It follows that we find no merit to this issue.
II. INSURANCE PROCEEDS
¶ 26. The chancellor held that Pam was not entitled to any of the money that State Farm paid to Todd and Trust-mark Bank as a result of the claim for damage caused by Hurricane Katrina. However, the chancellor also held that Pam was “entitled to [one-half] of any and all monies paid by State Farm as a result of a claim for Katrina damage from and after March 9, 2010.” Pam claims the chancellor should have awarded her one-half of the insurance proceeds that were intended to repair damage caused by Hurricane Katrina.
¶ 27. As of the date of the September 2010 hearing, State Farm had paid $117,456.48 related to damage caused by Hurricane Katrina. The evidence presented demonstrated that the insurance proceeds went back into the house. As of the final hearing date, the house still needed substantial repairs to the roof and one wall. Pam argued that Todd had ineffectively managed the insurance proceeds in an effort to prevent the house from selling on the open market or receiving higher bids during the special commissioner’s auction. Among other things, Todd argued that Pam should not receive one-half of the insurance proceeds because she stopped *1113 contributing to the insurance premiums after she moved out. However, Pam essentially paid her share of the insurance premiums when the chancellor awarded Todd a setoff for Pam’s share of the house expenses. In any event, it was within the chancellor’s discretion to find that the insurance proceeds went back into the house and that Pam received her portion of the insurance proceeds through her share of the proceeds that resulted from Todd’s purchase of the house. We find no merit to this issue.
¶ 28. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. ISHEE AND JAMES, JJ., NOT PARTICIPATING.